**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| GWEN OGLESBY, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS, LLC, and SPECTRUM MANAGEMENT HOLDING COMPANY, LLC,<br><br>    Defendants. | Case No.<br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Gwen Oglesby ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Charter Communications, Inc. Charter Communications, LLC, and Spectrum Management Holding Company, LLC (collectively, "Defendants" or "Charter"). Plaintiff alleges the following based on personal knowledge as to her own acts and experiences, and upon information and belief, investigation of counsel, public reporting, related court filings, and other publicly available information as to all other matters.

### I.      INTRODUCTION

1.      This is a nationwide data breach class action arising from Charter's failure to reasonably secure, monitor, and protect the personal information, customer account information, and telecommunications-related information ("Sensitive Information") entrusted to them by millions of current, former, and prospective customers.

2.      Charter is one of the largest telecommunications and broadband providers in the United States and provides internet, mobile, video, voice, cable television, and related services to

tens of millions of current, former, and prospective customers across the country under the "Spectrum" brand.

3.      As a condition of obtaining or inquiring about Charter's services, Plaintiff and Class Members were required to provide Charter with Sensitive Information, including personally identifiable information ("PII") and account information, including names, email addresses, physical addresses, telephone numbers, account and plan information, customer support information, billing-related information, and telecommunications-related data, including Customer Proprietary Network Information ("CPNI") where applicable.

4.      Despite its role as a steward of highly valuable customer information, Charter failed to implement and maintain reasonable and appropriate safeguards over its systems and over the third-party software and software-as-a-service ("SaaS") environments it used to store and manage customer Sensitive Information.

5.      As a result, on or about April 1, 2026, a criminal extortion group known as "ShinyHunters" successfully compromised a Charter employee's Microsoft Entra (formerly Azure Active Directory) account using a voice-phishing ("vishing") attack. The threat actors then used that access to export millions of consumer and business customer records from Charter's Salesforce instance, stealing customer Sensitive Information and using it for extortion (hereinafter, the "Data Breach").

6.      Public reporting indicates that ShinyHunters claims to have stolen approximately forty million customer records, including, at a minimum, customer names, email addresses, physical addresses, telephone numbers, phone type, plan information, and customer support ticket data, and, according to the threat actors, at least some CPNI.[1] Although Charter has issued a public

---

[1] Although Charter has publicly attempted to limit the incident by stating that only sales tools were impacted and that no CPNI or sensitive personal information was released by the threat actor, those statements are

statement asserting that no "sensitive personal information (PI) or customer proprietary network information (CPNI)" was exfiltrated, that self-serving statement conflicts with the threat actors' detailed claims and does not negate the undisputed fact that large volumes of customer Sensitive Information —information Charter was obligated to safeguard—were accessed and exfiltrated by criminals.

7.    The Data Breach was not an unavoidable accident. It was the foreseeable result of Charter's failure to implement reasonable data-security, identity-and-access-management, SaaS-governance, monitoring, employee-training, data-minimization, and incident-response practices appropriate for a telecommunications provider entrusted with Sensitive Information.

8.    Charter's failure to adequately secure its SSO and SaaS environments, its failure to implement reasonable phishing-resistant authentication and access-control safeguards, and its failure to reasonably train and supervise its employees with respect to social-engineering risks directly enabled the ShinyHunters group to penetrate Charter's systems and steal Plaintiff's and Class Members' Sensitive Information.

9.    This incident is part of a broader social-engineering campaign by ShinyHunters targeting Microsoft Entra, Okta, and Google SSO environments to steal data from connected SaaS applications such as Salesforce, Microsoft 365, Google Workspace, SAP, Slack, Adobe, Atlassian, Zendesk, and Dropbox, which has affected hundreds of organizations. Charter knew or should have known of these risks given the widespread public reporting and the foreseeability of vishing-based compromises of SSO credentials yet failed to harden its systems accordingly.

---

inconsistent with the scope and nature of the data allegedly claimed by the threat actor. Charter controls the forensic information necessary to confirm the full scope of the Data Breach, the categories of information accessed, and the number of individuals affected.

10.    Charter's conduct is especially egregious because, as a major U.S. telecommunications provider, it is subject to heightened regulatory duties and industry expectations to safeguard customer Sensitive Information, including CPNI. Charter nonetheless failed to meet even basic standards of reasonable care in the design, implementation, and oversight of its data-security program and its use of Salesforce and SSO technologies.

11.    As a direct and proximate result of Charter's failures, Plaintiff's and Class Members' PII and other Sensitive Information are now in the hands of cybercriminals. Plaintiff and Class Members face an imminent and substantial risk of fraud, identity-theft-related harms, targeted phishing and vishing, account takeover, and privacy invasions for years to come. Plaintiff and Class Members have already expended, and will continue to expend, time and money to monitor accounts, change passwords, respond to suspicious contacts, and otherwise mitigate the heightened risks created by Charter's misconduct.

12.    Plaintiff brings this action to hold Charter accountable for its failure to protect customer Sensitive Information, its failure to comply with applicable legal and contractual obligations, and its unjust retention of the benefits derived from the PII it mismanaged. Plaintiff seeks damages, restitution, injunctive relief requiring meaningful security improvements, and all other relief permitted under law.

## II.    PARTIES

13.    Plaintiff Gwen Oglesby is a natural person and citizen of North Carolina who is a former customer of Charter/Spectrum during the relevant period. Plaintiff Oglesby provided PII and other Sensitive Information to Charter to obtain services, and Plaintiff Oglesby's Sensitive Information was compromised in the Data Breach.

14.     Defendant Charter Communications, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 400 Washington Boulevard, Stamford, Connecticut 06902. Charter Communications, Inc. is the parent company of the Spectrum brand and, directly or through its subsidiaries, provides cable, internet, telephone, and related services to consumers and businesses throughout the United States.

15.     Defendant Charter Communications, LLC is a Delaware limited liability company with its principal place of business in Stamford, Connecticut. It is a subsidiary and operating affiliate of Charter Communications, Inc. and is a provider of Spectrum-branded services, including in the District of Connecticut.

16.     Defendant Spectrum Management Holding Company, LLC is a Delaware limited liability company with its principal place of business in Stamford, Connecticut. Upon information and belief, it is responsible, directly or indirectly, for managing the systems, policies, and procedures related to Spectrum-branded customer accounts and data, including the collection, storage, and security of PII and other Sensitive Information.

17.     At all relevant times, Defendants collected, stored, used, and benefitted from Plaintiff's and Class Members' PII and other Sensitive Information in connection with the provision of Spectrum services, and at all relevant times Defendants were responsible for implementing and maintaining reasonable safeguards to protect that Sensitive Information.

### III.     JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which: (a) the proposed Class consists of at least one hundred members; (b) at least one Class Member is a citizen of a

state different from at least one Defendant; and (c) the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

19.     This Court has personal jurisdiction over each Defendant because each is headquartered and maintains its principal place of business in this District, regularly transacts business in this District, has substantial and continuous contacts with this District, and because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District. Plaintiff's claims arise out of and relate to Defendants' contacts with this District.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b) because one or more Defendants reside in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and Charter's decisions regarding data-security practices, use of Microsoft Entra SSO and Salesforce, and incident response were directed from its headquarters in Stamford, Connecticut.

## IV.     FACTUAL ALLEGATIONS

### A.     Charter's Business and Collection of PII.

21.     Charter is one of the largest telecommunications and broadband providers in the United States, serving tens of millions of residential and business customers through its Spectrum brand. It provides internet, cable television, mobile, and voice services, among others.

22.     To provide those services, Charter collects, stores, transmits, processes, and uses large volumes of Sensitive Information, including account data from current, former, and prospective customers. This Sensitive Information includes, but is not limited to, names, email addresses, mailing addresses, telephone numbers, phone types, account information, customer support ticket information, service-plan information, billing-related information, and telecommunications-related data.

23.     To initiate and maintain service, Charter requires customers to provide PII and other Sensitive Information, including, at a minimum, names, physical addresses, telephone numbers, email addresses, and service-plan and account details. Charter also maintains customer support ticket information and, in connection with its telecommunications services, certain CPNI, which can include information relating to the quantity, configuration, type, destination, location, and amount of use of a telecommunications service.

24.     Plaintiff and Class Members could not obtain Charter's services without providing Sensitive Information to Charter.

25.     Because Charter operates in the telecommunications sector, it also collects and maintains Sensitive Information, including CPNI or information alleged to include CPNI. Such Sensitive Information may reveal details about services purchased, billing relationships, network usage, and other telecommunications-related account activity.

26.     Charter represents to customers that it values and protects their privacy and the security of their information and implies that it uses industry-standard and reasonable administrative, technical, and physical safeguards to protect such data. Customers reasonably rely on these representations and Charter's position as a major regulated telecommunications carrier when deciding to purchase and continue using Spectrum services and to entrust their Sensitive Information to Charter.

27.     Plaintiff and Class Members were required to submit their PII and other Sensitive Information to Charter to obtain or apply for its products and services. In exchange for the payment of monthly fees and other charges, Charter agreed—explicitly and implicitly—to safeguard Plaintiff's and Class Members' PII and other Sensitive Information to use it only for legitimate business purposes.

28.     Charter knew or should have known that the Sensitive Information it collected and maintained was highly valuable to cybercriminals and that unauthorized access to that Sensitive Information would expose Plaintiff and Class Members to identity theft, fraud, phishing, smishing, vishing, account takeover, social engineering, targeted scams, loss of privacy, and other harms.

29.     Therefore, Charter owed Plaintiff and Class Members duties to exercise reasonable care in collecting, storing, maintaining, using, and protecting their Sensitive Information.

30.     Those duties arose from, among other things:

- Charter's collection of sensitive customer information;

- Charter's role as a telecommunications provider;

- Charter's superior knowledge and control over its systems;

- Charter's representations and privacy commitments concerning customer information;

- The foreseeable risk of cyberattacks targeting customer data;

- The relationship between Charter and its customers;

- Federal and state laws and regulatory expectations governing data security and telecommunications information;

- Industry standards concerning authentication, access control, monitoring, incident response, and data minimization.

31.     Plaintiff and Class Members did not consent to Charter maintaining their Sensitive Information in an unreasonably insecure manner or exposing it to unauthorized third parties.

32.     As set forth below, Charter breached its duties by failing to implement reasonable safeguards and by failing to provide timely, accurate, and complete notice of the incident.

B.      **ShinyHunters' April 2026 Attack on Charter.**

33.      On or around April1, 2026, Charter suffered a cybersecurity incident (the "Data Breach") that resulted in unauthorized access to and exfiltration of Sensitive Information maintained in Charter's systems.

34.      The Data Breach was carried out by or associated with the threat actor known as ShinyHunters, a cybercriminal group publicly associated with data theft, extortion, and publication or threatened publication of stolen information.

35.      On May 26, 2026, public reports revealed that Charter had been listed on the ShinyHunters extortion group's data-leak site and that Charter had confirmed it suffered a Data Breach.

36.      According to the threat actors, they breached Charter on April 1, 2026, through a voice-phishing (vishing) attack targeting a Charter employee. The attack compromised that employee's Microsoft Entra account—an SSO credential that provided access to Charter's integrated SaaS applications.

37.      Microsoft Entra functions as an identity and access-management platform used by organizations to authenticate users and provide access to enterprise applications. Where improperly configured, insufficiently monitored, or inadequately protected against social engineering, compromise of an Entra credential can allow attackers to move beyond a single employee account and access connected cloud-based applications.

38.      After compromising employee access, the attackers accessed Charter's Salesforce environment. Salesforce environments commonly contain customer relationship management data, sales records, prospect records, customer contact information, account notes, service information, and related business records.

39.     Once inside Charter's environment, the attackers used the compromised Microsoft Entra credentials to access and export millions of consumer and business records containing Sensitive Information from Charter's Salesforce instance. Public reporting indicates that the stolen data includes customer names, email addresses, physical addresses, telephone numbers, phone type, plan information, and support ticket data, and the threat actors claim to have also obtained some CPNI data.

40.     ShinyHunters exfiltrated substantial quantities of Charter customer Sensitive Information from the Salesforce environment or related systems. The compromised data includes names, email addresses, postal addresses, phone numbers, phone types, plan information, account-related data, support-ticket information, billing-related information, and CPNI or information alleged to include CPNI.

41.     The exfiltrated data also included records relating to Charter employees, including work email addresses, job titles, and, in some instances, home addresses.

42.     The apparent inclusion of employee-related records further supports the inference that the incident was not limited to isolated customer-contact information but involved broader access to Charter-controlled business systems.

43.     The potential compromise of both customer and employee Sensitive Information also suggests that Charter's access controls, data segmentation, and monitoring were inadequate to prevent unauthorized actors from accessing multiple categories of data.

44.     To the extent Charter stored employee and customer Sensitive Information in overlapping systems or failed to segregate access appropriately, Charter increased the risk that compromise of one account or application would expose multiple data sets.

45. The reported number of affected records is massive. More than 40 million private records containing Sensitive Information were stolen.

46. Charter issued a public statement that it was "following our security protocols" and "in the process of alerting appropriate authorities," and asserted that "[n]o sensitive personal information (PI) or customer proprietary network information (CPNI) data was exfiltrated by the threat actor as a result of recent activity."

47. ShinyHunters, by contrast, claimed that it had stolen forty million records containing the personal information of Charter's consumer and business customers.

48. At this stage, Charter has not provided Plaintiff and Class Members with a complete, transparent, and forensic account of when the intrusion began, when it was detected, what systems were accessed, what data was acquired, and when the threat actor's access was fully terminated.

**C.     Charter's Security Failures.**

49. The Data Breach resulted from Charter's failure to implement and maintain reasonable security measures appropriate for the sensitivity and volume of data it collected and maintained.

50. Reasonable security measures for a company like Charter include phishing-resistant multi-factor authentication for privileged, administrative, and sensitive SaaS access; conditional access controls; device posture controls; least-privilege permissions; just-in-time access; role-based access management; and restrictions on bulk exports of customer data.

51. Reasonable security also includes robust monitoring for suspicious authentication activity, impossible travel, anomalous login patterns, new device enrollment, unusual privilege

escalation, abnormal Salesforce queries, excessive API activity, and bulk export activity inconsistent with ordinary business needs.

52.    Charter failed to adequately safeguard its Microsoft Entra and Salesforce environments, failed to prevent unauthorized access resulting from social engineering, failed to detect suspicious activity in a timely manner, and failed to prevent or restrict the export of large quantities of customer Sensitive Information.

53.    Charter also failed to implement adequate data-loss prevention controls, segmentation, masking, encryption or tokenization where appropriate, retention limits, audit logging, alerting, incident-response procedures, and employee training designed to address the well-known risk of vishing attacks targeting help desks, employees, and identity platforms.

54.    Charter's failures include, but are not limited to, the failure to:

- Implement or enforce phishing-resistant authentication for access to sensitive systems;

- Adequately protect Microsoft Entra and single sign-on credentials from social-engineering compromise;

- Restrict employee access to sensitive Salesforce data on a least-privilege basis;

- Use effective conditional access policies to detect and block suspicious logins;

- Monitor for unusual Salesforce activity, including mass data exports, unusual query volume, abnormal download behavior, or access from atypical devices or locations;

- Apply adequate data-loss prevention controls to prevent bulk exfiltration;

- Segment access between ordinary sales tools and databases containing large volumes of customer information;

- Maintain sufficient logging and alerting to promptly detect unauthorized access;

12

- Train employees to recognize and report vishing and credential-harvesting attacks;

- Properly supervise third-party, SaaS, and cloud environments used to store or process customer data;

- Maintain and test an incident-response program capable of quickly identifying the nature and scope of a breach;

- Limit retention of customer and employee data to what was reasonably necessary;

- Encrypt, tokenize, mask, or otherwise protect sensitive data stored in customer-management systems; and

- Provide prompt and complete notice to affected individuals.

55.    Indeed, a large-scale export of customer records from a Salesforce environment should have triggered prompt security review, particularly if the activity was conducted through a compromised employee credential, involved unusual access patterns, or was inconsistent with the employee's normal duties.

56.    Charter's failure to prevent or promptly detect the activity suggests inadequate controls over its identity-management environment, customer-data repositories, and SaaS applications.

57.    Charter's failure is especially serious because telecommunications providers collect and maintain Sensitive Information that can reveal where customers live, how they communicate, what services they use, and how they can be contacted.

58.    Given Charter's size, resources, telecommunications operations, and knowledge of the sensitivity of the data at issue, these failures were unreasonable and fell below the standards expected of entities entrusted with customer Sensitive Information.

**D.    ShinyHunters' 2026 Campaign Was Widely Reported.**

59.    The ShinyHunters attack on Charter is consistent with a broader 2026 vishing and SaaS-extortion campaign in which the group targets Microsoft Entra, Okta, and Google SSO accounts via social engineering phone calls, obtains valid SSO credentials and MFA responses in real time, pivots into SaaS ecosystems like Salesforce, and conducts bulk data exports for extortion.

60.    In ShinyHunters' campaign, the attackers do not exploit a software vulnerability; instead, they exploit weaknesses in organizations' identity-and-access-management controls, over-privileged SSO accounts, insufficiently hardened MFA configurations, poor monitoring of SaaS-data exports, and inadequate employee training and procedures to resist vishing and related social-engineering schemes.

61.    ShinyHunters' playbook was widely reported upon.

62.    In or about 2024, ShinyHunters publicly claimed responsibility for data theft campaigns targeting Snowflake-hosted customer data for major enterprises, including Ticketmaster and Santander Bank, in which hundreds of millions of customer records were purportedly stolen and offered for sale on underground markets. Public reports indicate that the attackers used compromised contractor or integration credentials to access multiple customers' cloud environments and exfiltrate large volumes of personal and financial information, which they then used as leverage for extortion demands.

63.    In 2025 and 2026, ShinyHunters was further linked by Google's Threat Intelligence Group (formerly Mandiant) and independent security researchers to a series of unprecedented campaigns against Salesforce customers, in which the group allegedly stole OAuth tokens from third-party integrations and then accessed hundreds of Salesforce organizations.

14

64. In an August 2025 campaign tracked as "UNC6395," ShinyHunters reportedly used tokens associated with an email-marketing integration to log into approximately 760 distinct Salesforce customer instances over a period of days, systematically exporting CRM data across "Account," "Contact," "Case," "Opportunity," and "User" tables. An estimated 1.5 billion records were stolen from more than 700 organizations, including prominent technology and financial-services companies, and victim firms subsequently reported receiving extortion demands threatening publication of their data.

65. Shortly thereafter, in November 2025, ShinyHunters was associated with a second wave of attacks abusing OAuth tokens tied to another Salesforce integration, in which at least 200 to 285 additional Salesforce customer environments were reportedly compromised. Public disclosures tied to this wave identified numerous large enterprises—including technology vendors, security companies, and communications providers—as victims whose Salesforce instances had been accessed and whose customer data had been exfiltrated for extortion purposes.

66. By early 2026, security advisories and threat-intelligence reports described ShinyHunters as a leading participant in a broader wave of SaaS-focused intrusions and SSO-abuse campaigns, including attacks that targeted Okta and other identity-provider environments through highly tailored vishing and adversary-in-the-middle phishing. These campaigns often combined: (a) real-time social-engineering phone calls impersonating corporate IT support; (b) look-alike login portals harvesting SSO credentials and MFA codes; and (c) rapid lateral movement from SSO dashboards into connected cloud services such as Salesforce, Microsoft 365, and file-sharing platforms.

67. According to these reports, ShinyHunters and closely allied actors used this access to steal vast quantities of customer and user data from universities, consumer-facing platforms,

financial-technology firms, and hospitality and gaming companies, again followed by ransom-style threats to leak or sell the data if victims refused to pay.

68. In March 2026, Salesforce itself issued a public advisory attributing a series of data-theft incidents to a "known threat group" exploiting misconfigurations in its Experience Cloud ("Aura") product, which ShinyHunters then claimed to be behind on its own data-leak site.

69. In that campaign, ShinyHunters allegedly used custom tools and a modified version of Google's AuraInspector extension to scan for and exploit misconfigured customer portals, ultimately claiming to have accessed the environments of hundreds of additional organizations, including large technology providers and identity-management vendors. As in its prior campaigns, ShinyHunters reportedly contacted victim organizations with demands for payment in exchange for suppressing the publication of stolen data.

70. Taken together, these and other incidents demonstrate that ShinyHunters has established a well-known pattern of targeting large enterprises that store extensive volumes of customer information in cloud and SaaS platforms, including telecommunications providers, financial institutions, major consumer-facing brands, and technology companies. That pattern includes: (a) compromising identity and access-management controls through social engineering and token theft; (b) silently exfiltrating massive datasets of personally identifiable information ("PII") and other customer records; and (c) attempting to monetize those thefts through a combination of extortion, dark-web sales, and public leaks.

71. Given ShinyHunters' highly public track record of large-scale breaches and extortion attempts, Charter either knew or should have known that threat actors like ShinyHunters posed a foreseeable and severe risk to the confidentiality of Charter's Sensitive Information and that Charter therefore needed to implement and maintain robust, defense-in-depth security

16

controls—including strong identity-and-access safeguards, rigorous monitoring of SaaS and CRM environments such as Salesforce, and prompt incident detection and response—to protect Plaintiff's and Class Members' data from precisely the type of attack alleged in this action.

**E.    The Sensitivity and Value of the Compromised Data.**

72.    The information compromised in the Data Breach is valuable to cybercriminals because it can be used to identify, target, impersonate, contact, profile, and defraud individuals.

73.    Even where a data set does not contain Social Security numbers or financial account numbers, names combined with email addresses, physical addresses, telephone numbers, account details, plan information, support-ticket information, and telecommunications-related data can enable targeted phishing, smishing, vishing, SIM-swap attempts, credential-harvesting schemes, account takeover, and identity fraud.

74.    Telecommunications-related information is especially sensitive because it can reveal a consumer's service relationship, account status, device or phone information, usage-related details, billing relationship, and other facts that make scams more convincing and more difficult to detect.

75.    Once exposed, Sensitive Information cannot be made private again. Plaintiff and Class Members therefore face a continuing risk that their information will be used, combined with other data, sold, traded, republished, or exploited for years.

76.    Charter's assertion that no "sensitive personal information (PI) or CPNI data was exfiltrated" is at odds with ShinyHunters' detailed representations of the stolen data and with public threat-intelligence reports describing the nature and volume of records exported from Charter's Salesforce instance. To the extent Charter seeks to minimize its obligations by narrowly construing "sensitive" PI or CPNI, that is legally irrelevant; Charter knew that any unauthorized

17

access and exfiltration of customer PII and other Sensitive Information would foreseeably lead to increased risks of fraud, identity theft, and targeted scams.

77.     Notwithstanding the public nature of the Data Breach, Charter has, upon information and belief, provided inconsistent, incomplete, or delayed information to affected customers about the nature and scope of the Data Breach, the categories of data compromised, and the steps it is taking to remediate and prevent future breaches. This lack of transparency has hindered Plaintiff's and Class Members' ability to protect themselves and further underscores Charter's inadequate incident-response practices.

78.     "ShinyHunters" is a financially-motivated, black-hat hacking and extortion group that has been active since at least 2019 and has been involved in a large number of major data breaches worldwide. Public reporting, including threat-intelligence analyses and law enforcement statements, describes ShinyHunters as a loosely organized but highly capable criminal ecosystem that specializes in penetrating cloud and SaaS environments, exfiltrating massive quantities of customer and employee data, and then attempting to extort victim companies under a "pay-or-leak" model.

79.     ShinyHunters and its affiliates have repeatedly used sophisticated social-engineering techniques, including voice phishing ("vishing") and credential-harvesting websites, to trick employees and contractors into divulging usernames, passwords, and multi-factor authentication ("MFA") codes for corporate single-sign-on ("SSO") systems such as Okta and Microsoft Entra ID.

80.     Once inside a target's SSO environment, ShinyHunters often abuses OAuth tokens and other trust relationships to pivot into connected SaaS platforms—such as Salesforce, Snowflake data warehouses, Microsoft 365, and other cloud services—where it conducts bulk data

exports of customer relationship management ("CRM") records, support tickets, analytics data, and other sensitive information. Victim organizations then receive extortion emails demanding large ransom payments in cryptocurrency in exchange for promises not to leak or sell the stolen data on dark-web forums.

**F.     Charter's Knowledge of the Risk and Its Failure to Implement Reasonable Security.**

81.     The attack vector was not novel or unforeseeable. Social-engineering attacks targeting identity providers, single sign-on systems, and cloud-based SaaS environments have been widely recognized as a serious and recurring threat, particularly for large enterprises that store customer information in platforms such as Salesforce.

82.     Charter, as a sophisticated telecommunications conglomerate that handles Sensitive Information for tens of millions of customers, was well aware, or should have been well aware, of the risks posed by social-engineering attacks targeting SSO platforms and SaaS applications. Public reporting since at least 2024 has chronicled large-scale ShinyHunters-linked campaigns leveraging SSO credential theft to access cloud-hosted data and extort organizations, including high-profile incidents involving Salesforce environments and other major SaaS platforms.

83.     Large enterprises have increasingly moved Sensitive Information into cloud-based SaaS platforms, including customer-relationship-management systems such as Salesforce.

84.     Cyberattacks targeting telecommunications companies, cloud applications, identity platforms, CRM systems, and large repositories of customer Sensitive Information are not novel or unforeseeable. They are recurring, well-known risks that responsible companies must address through layered controls.

85.    Vishing and other social-engineering attacks targeting employee credentials are also foreseeable. Attackers routinely target employees and help desks to gain access to cloud-based applications and SaaS environments containing valuable customer information.

86.    The risk of vishing and credential-based attacks was well known before the Data Breach.

87.    Charter knew or should have known that a compromise of a single employee account could expose large volumes of Sensitive Information if Charter failed to implement strong authentication, least privilege, export limits, monitoring, and segmentation.

88.    Charter also knew or should have known that Sensitive Information maintained in Salesforce and related systems was valuable, sensitive, and subject to heightened risk of misuse if accessed by cybercriminals.

89.    Charter's size, customer base, telecommunications role, and possession of customer contact and account information made it a predictable target for credential theft, extortion, and data exfiltration.

90.    Charter also knew, or should have known, based on industry and regulatory guidance, that it had duties to: design security programs that account for social-engineering threats; implement phishing-resistant authentication methods, especially for privileged and SSO accounts; adopt least-privilege access controls and robust role-based permissions in Salesforce and other SaaS systems; monitor for anomalous or large-scale data exports; and provide adequate training and clear procedures for employees to verify and respond to purported IT or security calls.

91.    Despite Charter's knowledge and ability to foresee these kinds of attacks, Charter failed to implement security controls sufficient to prevent the Data Breach, detect it promptly, stop

20

exfiltration, provide adequate notice, and mitigate the resulting harm to Plaintiff and Class Members.

92.     Charter's systems and policies were vulnerable to exactly the kind of attack by ShinyHunters. By designing and maintaining an environment in which a single Microsoft Entra account could be compromised through a phone-based social-engineering attack and then used to export tens of millions of customer records from Salesforce, Charter failed to employ basic principles of least privilege, robust authentication, and SaaS-security governance that are widely recognized and reasonably available.

93.     Despite the known and foreseeable risks described herein, Charter failed to implement reasonably appropriate safeguards. Among other things, Charter failed to adequately restrict what a single employee's SSO account could access or export, failed to ensure that privileged access to Salesforce and associated data exports required additional verification and oversight, and failed to adequately monitor for or block high-volume data extractions from Salesforce that were inconsistent with legitimate business needs.

94.     Charter also failed to implement sufficiently robust multi-factor authentication and identity-verification processes to prevent a vishing attacker from obtaining and using SSO credentials. Reasonable measures—such as phishing-resistant authentication methods, strict device and network controls for authentication, and mandatory out-of-band verification for identity or MFA changes—were either not in place or not effectively enforced.

95.     Charter's failures are particularly egregious when viewed against the backdrop of other major data breaches in the telecommunications and technology sectors caused by unpatched vulnerabilities or exploited third-party products, which have been widely reported and have led to heightened expectations for risk-based security programs.

96.    In addition, Charter knew that the PII and Sensitive Information it collected from customers was highly valuable to cybercriminals, that such data could be used to facilitate identity theft, financial fraud, targeted phishing and vishing campaigns, and other harms, and that a breach of such data would subject its customers to years of ongoing risk.

97.    Charter therefore should have implemented controls specifically designed to prevent the very type of attack alleged here: social engineering of an employee, compromise of an identity-management account, access to a connected SaaS environment, and bulk export of Sensitive Information.

98.    Notwithstanding this knowledge, Charter chose to implement and maintain an inadequate security posture that prioritized operational convenience and profitability over meaningful protection of Sensitive Information. In doing so, Charter saved costs associated with more robust security controls and training, while externalizing the risk and resulting harms onto Plaintiff and Class Members.

99.    Charter's failure to prevent, detect, contain, and timely disclose the incident demonstrates that its security program did not reasonably account for known and foreseeable attack methods.

**G.    Delayed, Incomplete, and Inadequate Notice.**

100.    Charter failed to provide Plaintiff and Class Members with timely, complete, and adequate notice of the Data Breach.

101.    Upon information and belief, Charter knew or should have known of unauthorized access before Plaintiff and Class Members received any meaningful notice sufficient to permit them to protect themselves from identity theft, fraud, phishing, or account misuse.

22

102.    Charter's public statements have minimized or obscured the scope of the Data Breach by suggesting that only sales tools were affected and that no CPNI or sensitive personal information was released by the threat actor. Those statements do not provide Plaintiff and Class Members with the information necessary to understand whether their Sensitive Information was accessed, what categories of data were compromised, when the access occurred, how long the attackers maintained access, or what Charter did to prevent recurrence.

103.    Charter's incomplete disclosures forced Plaintiff and Class Members to bear the burden of uncertainty. Without a complete account of the Data Breach, Class Members cannot determine what steps they must take to protect themselves or their households.

**H.    Plaintiff's and Class Members' Injuries.**

104.    Plaintiff and Class Members entrusted their Sensitive Information to Charter as a condition of obtaining internet, cable, mobile, voice, or related services.

105.    Plaintiff Oglesby has been a Charter customer for more than 15 years.

106.    Plaintiff Oglesby was required to provide her PII and other Sensitive Information to Charter as a condition of receiving Charter's services.

107.    Plaintiff Oglesby, like other Class Members, reasonably expected that Charter would protect her Sensitive Information using security practices appropriate for a large telecommunications provider.

108.    As a direct and proximate result of the Data Breach, Plaintiff Oglesby's and Class Members' PII and other Sensitive Information have been exposed to and exfiltrated by cybercriminals. The compromised data—including names, contact information, account and plan details, and support-ticket information—can be and already is being used to facilitate targeted scams, phishing and vishing attacks, and other forms of fraud.

23

109.    As a result of the breach, Plaintiff Oglesby and Class Members face a heightened and continuing risk of harm because their Sensitive Information may now be in the possession of criminals or other unauthorized persons.

110.    Indeed, Plaintiff Oglesby has already suffered attempted fraudulent charges and transactions.

111.    The compromised Sensitive Information is valuable because it can be used alone or in combination with other information to facilitate:

- Targeted phishing;

- Credential-harvesting schemes;

- Impersonation of Charter or Spectrum representatives;

- Account takeover attempts;

- SIM-swap or phone-based fraud attempts;

- Social-engineering attacks;

- Identity theft;

- Spam, scam calls, and fraudulent solicitations;

- Synthetic identity fraud;

- Harassment or unwanted contact; and

- Doxxing or exposure of residential addresses.

112.    Information such as a customer's name, address, telephone number, email address, service plan, and account relationship with Charter allows scammers to craft communications that appear legitimate because they contain accurate personal details.

113.    If support-ticket information was compromised, the risk is even greater because such records may include narrative information supplied by customers, details concerning service

24

problems, billing issues, household circumstances, or other context that can be exploited in future scams.

114.    If CPNI or telecommunications-related information was compromised, the harm is particularly serious because such Sensitive Information may reveal details about a customer's telecommunications services, account relationship, or usage patterns.

115.    Plaintiff Oglesby and Class Members face an imminent and continuing risk of identity-theft-related harms, including, but not limited to, unauthorized account access or changes, the opening of new accounts in their names, targeted social-engineering attempts using detailed knowledge of their Spectrum services, and a loss of privacy and peace of mind. The risk is heightened because attackers possess not only basic contact information but also contextual account and plan data that can be used to craft highly convincing fraudulent communications.

116.    Plaintiff Oglesby Class Members have suffered or are at imminent risk of suffering concrete injuries, including:

- Loss of privacy;
- Loss of control over personal information;
- Diminution in the value of their personal information;
- Out-of-pocket costs for mitigation;
- Time spent monitoring accounts and communications;
- Increased spam, phishing, or scam communications;
- Emotional distress and anxiety;
- Benefit-of-the-bargain damages;
- Increased risk of fraud and identity theft; and
- The need for credit monitoring, identity-theft protection, and other remedial services.

25

117. These harms are not speculative. The alleged theft and threatened or actual publication of Sensitive Information by a known cybercriminal group creates a present and continuing risk that the information will be misused.

118. Following the Data Breach, Plaintiff Oglesby experienced suspicious activity associated with misuse of her information. In approximately April 2026, her bank, USAA, detected attempted fraudulent charges on her bank account or debit card, including attempted purchases of Amazon gift cards and another unauthorized item.

119. Plaintiff Oglesby also experienced a marked increase in spam and phishing calls for approximately two to three weeks.

120. As a result of the Data Breach, Plaintiff Oglesby spent time and effort monitoring her accounts, contacting her bank, and removing payment information from Amazon autopay in an effort to mitigate the risk of fraud and identity theft.

121. She spent hours responding to the breach and the suspicious activity that followed.

122. Plaintiff Oglesby has also experienced anxiety and fear of identity theft following the Data Breach and remains subject to a continuing heightened risk of fraud, phishing, impersonation, and identity theft as a result of Charter's failure to safeguard her information.

123. Moreover, Plaintiff Oglesby and Class Members have already incurred, and will continue to incur, out-of-pocket expenses and opportunity costs, including but not limited to costs associated with credit monitoring or identity-protection services (if not adequately provided by Charter), time and effort spent changing passwords and security questions, monitoring account statements and credit reports, responding to suspicious communications, and addressing and mitigating potential identity-theft incidents.

26

124.    Plaintiff Oglesby and Class Members also suffered diminution in value of their personal information, which now resides in criminal hands and has likely been, or will be, trafficked on underground markets, as well as a loss of the benefit of their bargain with Charter, who promised, explicitly or implicitly, to provide reasonably secure services but instead delivered services with materially deficient data security.

125.    Plaintiff Oglesby and Class Members would not have entrusted their PII and other Sensitive Information to Charter, or would have required different terms or paid less for services, had they known that Charter would fail to implement reasonable and appropriate security measures and that Charter's systems were vulnerable to a single vishing attack resulting in the mass exfiltration of Sensitive Information.

126.    Plaintiff Oglesby and Class Members will continue to face an elevated risk of identity theft, targeted fraud, and other harms for years to come because their Sensitive Information, once exposed, cannot be retrieved from the cybercriminal ecosystem.

## V.    CLASS ACTION ALLEGATIONS

127.    Plaintiff Oglesby brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated.

128.    Nationwide Class Definition. Plaintiff seeks to represent a Nationwide Class defined as follows:

> All natural persons in the United States whose personally identifiable information and/or Sensitive Information was accessed, exfiltrated, or otherwise compromised in connection with the Charter Data Breach first publicly disclosed in or about May 2026 and believed to have occurred on or about April 1, 2026.

129. North Carolina Subclass Definition. Plaintiff also seeks to represent a North Carolina Subclass defined as follows:

> All members of the Nationwide Class who were residents of North Carolina at the time of the Charter Data Breach.

130. Excluded from the Class and Subclass are: (a) Defendants and their subsidiaries and affiliates; (b) all officers and directors of Defendants; (c) any entity in which Defendants have a controlling interest; (d) Defendants' legal representatives, heirs, successors, or assigns; and (e) any judge assigned to this case, his or her staff, and the members of his or her immediate family.

131. *Numerosity.* The members of the Nationwide Class and North Carolina Subclass are so numerous that joinder of all members is impracticable. Public reporting indicates that ShinyHunters claims to have stolen approximately forty million customer records from Charter. On information and belief, thousands of those customers reside in North Carolina.

132. *Commonality.* There are questions of law and fact common to the Class and Subclass, including, but not limited to: whether Charter had a duty to protect Plaintiffs' and Class Members' PII and other Sensitive Information; whether Charter's security measures were reasonable; whether Charter's acts and omissions caused or contributed to the Data Breach; whether Charter's conduct violated applicable consumer-protection laws; whether Charter breached its contracts with Plaintiff and Class Members; and the nature and extent of damages and injunctive relief appropriate for the Class and Subclass.

133. *Typicality.* Plaintiff's claims are typical of the claims of the Class and Subclass because Plaintiff, like all Class Members, was a customer of Charter whose PII and customer Sensitive Information was entrusted to Charter and exposed as a result of the same Data Breach and the same course of conduct by Charter.

134.    ***Adequacy.*** Plaintiff will fairly and adequately protect the interests of the Class and Subclass. Plaintiff has no interests antagonistic to the interests of other Class Members and has retained counsel experienced in complex litigation, including consumer privacy and data-breach class actions.

135.    ***Predominance.*** Questions of law and fact common to the Class and Subclass predominate over any questions affecting only individual members. The central issues in this case—Charter's duty, knowledge, security practices, and conduct giving rise to the Data Breach—are common to all Class Members and can be resolved on a class-wide basis.

136.    ***Superiority.*** A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The damages suffered by individual Class Members are small relative to the burden and expense required to individually litigate their claims against a large corporate defendant. Class treatment will conserve judicial resources and avoid inconsistent or potentially conflicting judgments.

137.    ***Rule 23(b)(2) Injunctive Relief.*** Charter has acted or refused to act on grounds generally applicable to the Class and Subclass, making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class and Subclass as a whole. Plaintiff seeks, among other things, orders requiring Charter to implement and maintain robust security measures, submit to independent security audits, and provide appropriate relief and monitoring services to Class Members.

## VI.    CAUSES OF ACTION

## COUNT I: NEGLIGENCE

### (On behalf of Plaintiff, the Nationwide Class, and the North Carolina Subclass, against all Defendants)

138.    Plaintiff restates and realleges the preceding paragraphs as if fully set forth herein.

139.    As a condition of obtaining Charter's services, Plaintiff and Class Members were required to provide Charter with their PII and other Sensitive Information. Charter knew that it was collecting, storing, and using this Sensitive Information, and that the Sensitive Information was highly valuable and attractive to cybercriminals.

140.    Charter owed Plaintiff and Class Members a duty to exercise reasonable care in collecting, storing, securing, and safeguarding their PII and Sensitive Information. This duty included, but was not limited to, the duties to: (a) design, implement, and maintain reasonable and appropriate security measures to protect PII and other Sensitive Information ; (b) adequately secure its SSO and SaaS environments, including Microsoft Entra and Salesforce; (c) implement phishing-resistant authentication and robust access-control measures; (d) monitor for and promptly detect unauthorized access and anomalous data exports; and (e) properly train and supervise employees to recognize and resist social-engineering attacks such as vishing.

141.    Charter knew or should have known that its failure to implement reasonable and appropriate security measures would foreseeably result in the unauthorized access and exfiltration of Plaintiffs' and Class Members' PII and other Sensitive Information and would subject them to a heightened risk of identity theft, fraud, and related harms.

142.    Charter breached its duties of care by, among other things: (a) failing to design and implement reasonable security safeguards for its SSO and SaaS environment; (b) failing to employ phishing-resistant authentication and robust access controls, especially for SSO accounts with

access to Salesforce; (c) granting excessive privileges to individual SSO accounts, allowing one compromised Entra account to export tens of millions of records; (d) failing to monitor for and detect large-scale data exports from Salesforce in a timely manner; (e) failing to adequately train and supervise its workforce on social-engineering and vishing threats; and (f) failing to timely and adequately notify Plaintiffs and Class Members of the nature and scope of the Data Breach.

143.    Charter's breaches of its duties were the direct and proximate cause of the Data Breach and of Plaintiffs' and Class Members' injuries. Absent Charter's negligent acts and omissions, ShinyHunters would not have been able to compromise a Charter employee's SSO account, pivot into Salesforce, and exfiltrate millions of customer records containing PII and Sensitive Information.

144.    As a direct and proximate result of Charter's negligence, Plaintiff and Class Members have suffered and will continue to suffer damages, including, but not limited to, the present and future risk of identity theft, fraud, and scams; out-of-pocket expenses for mitigation; loss of time and opportunity costs; diminution in the value of their personal information; and loss of the benefit of their bargain with Charter.

145.    Plaintiffs and Class Members are entitled to compensatory damages, restitution, and injunctive relief requiring Charter to implement and maintain adequate security measures.

## COUNT II: BREACH OF IMPLIED CONTRACT

(On behalf of Plaintiff, the Nationwide Class, and the North Carolina Subclass, against all Defendants)

146.    Plaintiff restates and realleges the preceding paragraphs as if fully set forth herein.

147.    When Plaintiff and Class Members decided to obtain Spectrum services, they provided Charter with their PII and Sensitive Information and agreed to pay Charter money in exchange for services. In doing so, Plaintiff and Class Members entered into implied contracts

with Charter whereby Charter agreed to provide the services in a reasonably secure manner and to safeguard their PII and Sensitive Information with reasonable and appropriate care.

148.    Charter's privacy policies, representations, and marketing statements, together with industry norms and the nature of the parties' relationship, gave rise to an implied contractual promise that Charter would implement and maintain reasonable security measures to protect Plaintiff's and Class Members' PII against unauthorized access and exfiltration.

149.    Plaintiff and Class Members accepted Charter's offers and paid for services in reliance on the implied promise that their PII and Sensitive Information would be protected. They would not have entrusted their PII and Sensitive Information to Charter, or would have paid less for services, had they known that Charter's security measures were unreasonable and inadequate.

150.    Charter breached its implied contracts with Plaintiff and Class Members by failing to adequately protect their PII and Sensitive Information; failing to implement reasonable security controls over its SSO and SaaS environment; failing to adequately monitor its systems; and failing to timely notify Plaintiff and Class Members of the Data Breach and the true scope of the compromise.

151.    As a direct and proximate result of Charter's breaches, Plaintiff and Class Members suffered damages, including, but not limited to, those described above, and they did not receive the full benefit of their bargain with Charter.

152.    Plaintiff and Class Members are entitled to damages, restitution, and specific performance (including, but not limited to, orders requiring Charter to implement reasonable security measures) to remedy Charter's breach of implied contract.

### COUNT III: UNJUST ENRICHMENT

(On behalf of Plaintiffs, the Nationwide Class, and the North Carolina Subclass, against all Defendants)

153.    Plaintiff restates and realleges the preceding paragraphs as if fully set forth herein.

154.    Plaintiff and Class Members conferred a benefit on Charter by providing their PII and other Sensitive Information and paying Charter for its services. Charter used Plaintiff's and Class Members' PII to conduct its business operations and derive revenue and profit, and it used a portion of the monies paid by Plaintiff and Class Members to fund its operations, including, ostensibly, its data-security program.

155.    Charter has been unjustly enriched by retaining and using Plaintiff's and Class Members' PII and by retaining the monies they paid for services without spending sufficient funds on reasonable and appropriate data security to protect that information, thereby retaining the difference as profit.

156.    Charter's retention of these benefits without adequate compensation to Plaintiff and Class Members is unjust because Charter misrepresented or omitted material facts about its data-security practices, failed to implement reasonable safeguards, and thereby exposed Plaintiff and Class Members to risk of harm and actual damages as described above.

157.    Principles of equity and good conscience require that Charter disgorge and make restitution of the benefits it unjustly obtained from Plaintiff and Class Members, including, but not limited to, the monetary value of the data it collected, the profits derived from using that data, and the portion of service fees that should have been used to provide reasonable data security.

## COUNT IV: VIOLATIONS OF NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (NCUDTPA), N.C. GEN. STAT. § 75-1.1 *et seq.*

(On behalf of Plaintiff and the North Carolina Subclass, against all Defendants)

158.    Plaintiff restates and realleges the preceding paragraphs as if fully set forth herein.

159.    Charter's conduct as alleged herein constitutes unfair and/or deceptive acts or practices in the conduct of trade or commerce in violation of NCUDTPA, including, but not limited

to: (a) misrepresenting that it would protect customers' PII and Sensitive Information and maintain reasonable security; (b) failing to disclose that its security practices were inadequate; (c) failing to implement reasonable safeguards over its SSO and SaaS environments; and (d) failing to timely and accurately disclose the nature and scope of the Data Breach.

160.    Charter's acts and omissions offend established public policy, are immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers that is not outweighed by any countervailing benefits and could not reasonably have been avoided by consumers.

161.    Charter's unfair and deceptive conduct occurred repeatedly and systematically and was directed at consumers generally.

162.    As a direct and proximate result of Charter's violations of NCUDPTA, Plaintiff and North Carolina Subclass Members suffered ascertainable losses, including the damages and harms described above, and are entitled to actual damages, punitive damages, costs, and reasonable attorneys' fees pursuant to N.C. Gen. Stat. § 75-1.1.

163.    Plaintiff and North Carolina Subclass Members also seek equitable relief under NCUDTPA, including injunctive relief requiring Charter to: (a) implement and maintain reasonably appropriate security measures; (b) undergo and publish the results of periodic independent security audits; (c) provide adequate identity-theft protection and credit monitoring services to affected consumers; and (d) refrain from misrepresenting or omitting material facts about its data-security practices.

## COUNT V: DECLARATORY AND INJUNCTIVE RELIEF

**(On behalf of Plaintiff, the Nationwide Class, and the
North Carolina Subclass, against all Defendants)**

164.    Plaintiff restates and realleges the preceding paragraphs as if fully set forth herein.

165. An actual controversy exists between the parties regarding Charter's present and ongoing obligations to employ reasonable data-security measures and to adequately protect Plaintiff's and Class Members' PII and Sensitive Information.

166. Plaintiff seeks a declaration that: (a) Charter's existing security measures are inadequate; (b) Charter's acts and omissions described herein constitute violations of its duties and of applicable law; and (c) Charter must implement and maintain security measures that comply with applicable legal and industry standards.

167. Plaintiff also seeks injunctive relief, including, but not limited to, an order requiring Charter to: implement and maintain comprehensive information-security programs that are reasonably designed to protect the confidentiality and integrity of PII; adopt phishing-resistant authentication for privileged and SSO accounts; apply least-privilege principles and enhanced monitoring for SaaS data exports; provide regular security training that includes vishing and social-engineering risks; and provide appropriate credit monitoring, identity-theft protection, and remediation services to Plaintiff and Class Members for a period sufficient to address the ongoing risks created by the breach.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Nationwide Class and North Carolina Subclass, respectfully requests that the Court enter judgment in their favor and against Defendants, and grant the following relief:

A.    Certify this action as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3); appoint Plaintiff as Class representative; and appoint Plaintiff's counsel as Class counsel;

B.    Award compensatory, actual, nominal, statutory, and punitive damages to Plaintiff and Class Members, in amounts to be determined at trial;

C.    Order restitution and disgorgement of all amounts wrongfully obtained by Charter as a result of its misconduct;

D.  Enter declaratory and injunctive relief as described above, including requiring Charter to implement and maintain adequate data-security measures and to provide appropriate identity-theft protection and monitoring to Plaintiff and Class Members;

E.  Award Plaintiff and Class Members their reasonable attorneys' fees and costs, including under CUTPA and any other applicable statute or common-law doctrine;

F.  Award pre-judgment and post-judgment interest as permitted by law; and

G.  Grant such other and further relief as the Court deems just and proper.

## VIII.   JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 8, 2026

Respectfully submitted,

**SILVER GOLUB & TEITELL LLP**

*/s/ Ian W. Sloss*
Ian W. Sloss (ct31244)
One Landmark Square, 15th Floor
Stamford, CT 06901
Tel: 203-325-4491
Email: isloss@sgtlaw.com

James J. Pizzirusso*
**HAUSFELD LLP**
1200 17th Street N.W., Suite 600
Washington, DC 20036
Tel: 202-540-7200
Email: jpizzirusso@hausfeld.com

Renner K. Walker*
Steven M. Nathan*
**HAUSFELD LLP**
33 Whitehall St., 14th Floor
New York, NY 10004
Tel: 646-357-1100
Email: rwalker@hausfeld.com
          snathan@hausfeld.com

*Application for admission *pro hac vice* forthcoming

*Attorneys for Plaintiff and the Class*